David K. TeSelle (#032057)
Joshua B. Abromovitz (#038401)
Patrick M. Sweet (pro hac vice)
Sophia E. Kyziridis (pro hac vice)
**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE, P.C.**
2390 East Camelback Road, Ste. 403
Phoenix, AZ 84016
Telephone: (602) 777-7000
Email: dteselle@burgsimpson.com
         jabromovitz@burgsimpson.com
         psweet@burgsimpson.com
         skyziridis@burgsimpson.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anton Anderson; Bethel Banabu; Anant Bhattacharya; Jennifer Bummer; Kevin Chapa; Azia Charles; Candice Chen; Shawn Day; Molly Earnhardt; Blake Falls; Adela Gallegos; Norbertha Garcia; Filipe Ginza; Kana Ginza; Rick Gonzalez; Chris Hall; Cairen Howard; Cameron James; Lok Sum Ida Lau; Jennifer Lee; Joshua Lim; Daniel Madison; Sawyer Mills; Young Noh; Jacklyn Pope; Felicia Ragsdale; Jackie Taylor; Paige Texas; Brianna Tittle; Jenesis Tucker; Christian Turner; Jon Watkins; and Jonathan Wizard, | No. CV-25-00923-PHX-SHD |
| Plaintiffs, | |
| v. | |
| Westwind School of Aeronautics Phoenix, LLC d.b.a. United Aviate Academy, a Delaware limited liability company; and United Airlines, Inc., a Delaware corporation, | **SECOND AMENDED COMPLAINT AND JURY DEMAND** |
| Defendants. | |

1

1    Plaintiffs Anton Anderson, Bethel Banabu, Anant Bhattacharya, Jennifer Bummer, Kevin

2    Chapa, Azia Charles, Candice Chen, Shawn Day, Molly Earnhardt, Blake Falls, Adela Gallegos,

3    Norbertha Garcia, Filipe Ginza, Kana Ginza, Rick Gonzalez, Chris Hall, Cairen Howard,

4    Cameron James, Lok Sum Ida Lau, Jennifer Lee, Joshua Lim, Daniel Madison, Sawyer Mills,

5    Young Noh, Jacklyn Pope, Felicia Ragsdale, Jackie Taylor, Paige Texas, Brianna Tittle, Jenesis

6    Tucker, Christian Turner, Jon Watkins, and Jonathan Wizard, by and through undersigned

7    counsel, Burg Simpson Eldredge Hersh & Jardine, P.C., submit their Second Amended Complaint

8    and Jury Demand against the Defendants, Westwind School of Aeronautics Phoenix, LLC d.b.a.

9    United Aviate Academy and United Airlines, Inc., and hereby allege and state as follows:

10    **STATEMENT OF THE CASE**

11    1.    This action seeks to hold Defendants Westwind School of Aeronautics Phoenix,

12    LLC d.b.a. United Aviate Academy ("UAA") and United Airlines, Inc. ("United") accountable

13    for their consumer fraud and deceptive trade practices. With promises of an expedited, 12-month

14    flight school program and a pipeline for employment as a commercial airline pilot, Defendants

15    deceived Plaintiffs into enrolling at great expense into UAA. The reality of UAA's program,

16    though, is that it was woefully under resourced and incapable of meeting the grand promises

17    Defendants made to lure these unsuspecting students.

18    **PARTIES**

19    2.    Anton Anderson is an individual who resides in Illinois.

20    3.    Bethel Banabu is an individual who resides in Virginia.

21    4.    Anant Bhattacharya is an individual who resides in Florida.

22    5.    Jennifer Bummer is an individual who resides in California.

23    6.    Kevin Chapa is an individual who resides in Texas.

24    7.    Azia Charles is an individual who resides in Georgia.

8. Candice Chen is an individual who resides in California.

9. Shawn Day is an individual who resides in Arizona.

10. Molly Earnhardt is an individual who resides in Texas.

11. Blake Falls is an individual who resides in Arizona.

12. Adela Gallegos is an individual who resides in New Mexico.

13. Norbertha Garcia is an individual who resides in Arizona.

14. Filipe Ginza is an individual who resides in Arizona.

15. Kana Ginza is an individual who resides in Arizona.

16. Rick Gonzalez is an individual who resides in Illinois.

17. Chris Hall is an individual who resides in Colorado.

18. Cairen Howard is an individual who resides in Illinois.

19. Cameron James is an individual who resides in Colorado.

20. Lok Sum Ida Lau is an individual who resides in Connecticut.

21. Jennifer Lee is an individual who resides in California.

22. Joshua Lim is an individual who resides in Texas.

23. Daniel Madison is an individual who resides in Arizona.

24. Sawyer Mills is an individual who resides in Virginia.

25. Young Noh is an individual who resides in Texas.

26. Jacklyn Pope is an individual who resides in Arizona.

27. Felicia Ragsdale is an individual who resides in Nevada.

28. Jackie Taylor is an individual who resides in California.

29. Paige Texas is an individual who resides in Florida.

30. Brianna Tittle is an individual who resides in Arizona.

31. Jenesis Tucker is an individual who resides in Texas.

1    32.    Christian Turner is an individual who resides in Nevada.

2    33.    Jon Watkins is individual who resides in Arizona.

3    34.    Jonathan Wizard is an individual who resides in California.

4    35.    UAA is a Delaware limited liability company with its principal place of business

5    per the Arizona Secretary of State located at 732 W. Deer Valley Road, Phoenix, AZ 85027. It is

6    authorized to do business in the state of Arizona and may be served through its registered agent,

7    CT Corporation System, 3800 North Central Avenue, Ste. 460, Phoenix, AZ 85012.

8    36.    United is a Delaware corporation with its headquarters located at 233 S. Wacker

9    Drive, Chicago, IL 60606. It is authorized to do business in the state of Arizona and may be served

10   through its registered agent, Corporation Service Company, 8825 N. 23rd Ave., Ste. 100, Phoenix,

11   AZ 85021.

12                          **JURISDICTION AND VENUE**

13   37.    The United States District Court for the District of Arizona has subject matter

14   jurisdiction over this action.

15   38.    The state and federal courts of Arizona have personal jurisdiction over Defendants

16   in this action because it arises out of Defendants' acts of consumer fraud occurring in the state of

17   Arizona and/or concerning services that are the subject of this action that were to be provided in

18   Arizona, specifically flight school education at UAA's facility in Maricopa County.

19   39.    Not only is United the owner of UAA—benefiting from the actions of UAA in

20   Arizona—and made misrepresentations at issue in this case in Arizona, but it directed its

21   marketing communications and tortious conduct towards the forum state, purchasing and

22   operating a flight school in Arizona, UAA, and making misrepresentations to drive students to

23   attend that school in Arizona.

24   40.    The state and federal courts of Arizona have general jurisdiction over UAA because

1   its principal place of business is located in Arizona.

2       41.    Venue is proper in this district because the conduct complained of in and/or the

3   services that are the subject of this action took place in Maricopa County.

4                          **GENERAL ALLEGATIONS**

5   **A.  <u>United purchases UAA and begins advertising a 12-month flight school program that
    would enable students to begin careers as commercial airline pilots.</u>**

6       42.    United launched in 2019 its "United Aviate" career development program, intending

7   to fill a need for thousands of new pilots over roughly the next decade.

8       43.    As part of growing its career development program, United purchased the Westwind

9   School of Aeronautics Phoenix, LLC, and rebranded it as UAA. The airline signed the purchase

10  agreement on February 5, 2020.

11      44.    United purchased the school, in part, to give the airline more visibility and direction

12  over the recruitment, development, and training of future pilots.

13      45.    United actively promoted UAA's program through its internal employee website,

14  "Flying Together."

15      46.    United's promotion of UAA on its internal platforms was accessible to pilots, flight

16  attendants, gate agents, and other employees, and was designed to inform and encourage employee

17  awareness of the UAA program.

18      47.    Information about UAA was widely shared and discussed among United employees,

19  including pilots, flight attendants, and gate agents.

20      48.    It was common knowledge within the United employee community that UAA

21  operated a flight school affiliated with United and that the program was a 12-month program.

22      49.    Upon information and belief, Westwind School of Aeronautics Phoenix, LLC, made

23  representations to United that the flight school the carrier was purchasing had the resources to

24  train hundreds of pilots per year.

50.     From the time of United's purchase to August of 2023, Dana Donati was the CEO of UAA.

51.     Upon information and belief, Ms. Donati made representations to United about UAA's ability to graduate certain students.

52.     Upon information and belief, to fulfill the promises she made to United, Ms. Donati personally intervened in the scheduling process for certain students to ensure those students progressed quicker, despite the effect it had on other students.

53.     United sought to graduate at least 300 students in UAA's first year.

54.     UAA and United represented to potential students, including Plaintiffs, that UAA provided an intensive program to obtain the FAA certifications necessary to become a commercial pilot in 12 months.

55.     United emailed potential students about their interest in UAA and invited them to complete video interviews as part of the selection process to attend UAA. The screenshot below, Figure 1, is an example of one such email.



Thank you for your interest in attending United Aviate Academy! We're excited to invite you to complete a video interview as part of the next step in the selection process.

When you begin the interview, you'll have the opportunity to view helpful resources before responding to interview questions.

Take time to read all instructions carefully before responding. Some questions may require you to respond in a specific format, within a set time limit, or with limited retakes.  Please complete your video interview within 7 days of receiving this email. After completing and submitting your interview, a notification will be sent to your recruiter for review.

*Figure 1*

56.     Defendants' representations were pervasive; including those made on UAA's website, websites United maintained such as unitedaviate.com, in emails to prospective students,

6

and other marketing materials and campaigns about the flight school.

57.    In an email marketing campaign, as shown below in Figure 2, Defendants touted the program to Plaintiffs as a "rigorous, year-long program." In reality, there was little likelihood of completing the program within a reasonable margin of the promised timeframe.



*Figure 2*

58.    The United Aviate website, shown below in Figure 3, represented that students would be able to complete the program within 12 months. The promise that a student could complete the program and be hired as a pilot within 12 months was central to the Defendants' entire plan to entice new students to UAA.

*Figure 3*

59.    Defendants also made these representations to prospective students in their enrollment agreements, admissions letters, and the UAA student handbook.

60.    The screenshot below, Figure 4, is a portion of the enrollment agreement stating the "Average Time to Completion" is "12 months to completion," which was not true.



*Figure 4*

61.    The screenshot below, Figure 5, is an excerpt from a UAA's Student Handbook stating "The timeline for this program is twelve months" which was not true.



*Figure 5*

62.    The screenshot below, Figure 6, is a portion of an admissions letter stating the "accelerated program" is "estimated to take about 11 months total" which was not true.



November 4, 2021

Dear Daniel,

Congratulations again on your admission to United Aviate Academy (UAA)! Now that you've completed the pre-enrollment, **we'd like to offer you a seat in the inaugural United Aviate Academy class starting on December 6, 2021!**

**Please confirm you are available and will accept this start date by signing below and returning this letter by November 8th.** You can upload it to your profile the same way you have submitted all other pre-enrollment documents (please name the file 'Class acceptance letter [your last name]'). If you would like to defer your class date to 2022, please send us an email at aviateacademy@aviateacademy.com or call us at 877–828–4283 as soon as possible.

As a reminder, this is a full time, accelerated program, estimated to take about 11 months total. To get you acclimated to the professional pilot lifestyle, we will run UAA on the same schedule as the United Airlines Flight Training Center, which means training could happen any day of the week and there are no extended holiday breaks. Our goal is to provide you world class training as quickly as we can so you can begin your path to United without delay.

We have included FAQs below, but please don't hesitate to reach out with any questions. The Academy Services team will host an info session in early November to provide more information and answer any additional questions you may have.

We look forward to welcoming you on your first day!

Sincerely,

United Aviate Academy Admissions

*Figure 6*

63.    Defendants made these representations knowing and/or with reason to know that they did not have the necessary resources to accommodate and graduate within 12 months the students they intended to enroll and/or did enroll and from whom they accepted payments. As

time went on, Defendants continued to make the same representations to new students despite knowing the representations were false.

64.    Defendants' representations were about fundamental characteristics of the service—education to become a commercial pilot—being offered.

65.    In particular, UAA and United initially represented to students that the program would have the following durations to obtain FAA certifications:

   a.  Private Pilot Training ("PPL"): 2 months;

   b.  Instrument Rating: 2 months;

   c.  Commercial Single-engine ("CSE"): 3 months;

   d.  Certified Flight Instructor ("CFI"): 2 months;

   e.  Certified Flight Instructor (Instrument) ("CFII"): 1 month;

   f.  Commercial Multi-engine ("CME"): 1 month; and

   g.  Multi-engine Flight Instructor ("MEI"): 1 month.

66.    UAA charged students tuition between $71,250 and $100,250 between 2021 and 2024.

67.    UAA mapped out for students the following tuition schedule that had them obtaining all program certificates in 12 months:

| Training Month | Training Certificate | Room & Board | Scholarship Schedule | Loan Disbursement Schedule | Student Self Pay Schedule |
|---|---|---|---|---|---|
| 1 | Private | $1,250 | | 2 Months of Living Expenses | $5,937.50 |
| 2 | Private | $1,250 | | | $5,937.50 |
| 3 | Instrument | $1,250 | 35,625.00 | $35,625 + 4 Months Living Expenses | $5,937.50 |
| 4 | Instrument | $1,250 | | | $5,937.50 |
| 5 | Commercial SEL | $1,250 | | | $5,937.50 |
| 6 | Commercial SEL | $1,250 | | | $5,937.50 |
| 7 | Commercial SEL | $1,250 | 35,625.00 | $35,625 + 6 Months Living Expenses | $5,937.50 |
| 8 | Commercial SEL | $1,250 | | | $5,937.50 |
| 9 | Commercial MEL | $1,250 | | | $5,937.50 |
| 10 | CFI | $1,250 | | | $5,937.50 |
| 11 | CFI | $1,250 | | | $5,937.50 |
| 12 | CFII & MEI | $1,250 | | | $5,937.50 |
| Total | | $1,500 | $71,250 | $71,250 + 12 Months Living Expenses | $71,250 |

*Figure 7*

68.    Students were also responsible for fees and costs associated with books, knowledge exams, and check rides estimated to cost roughly $10,000.

69.    UAA and United partnered with ZuntaFi, Sallie Mae and Liberty Bank to provide student loans to cover tuition, fees, and costs, including living expenses.

70.    UAA and United also partnered with JPMorgan Chase to fund scholarships for some students. The scholarships were awarded through the following Professional Pilot Groups: Latino Pilots Association, National Gay Pilots Association, Organization of Black Aerospace Professionals, Professional Asian Pilots Association, Sisters of the Skies, and Women in Aviation International.

71.    The majority of students, including most of Plaintiffs, were forced to take out student loans to attend the UAA program.

72.    Those students agreed to take out loans with the expectation that they were going to attend a 12-month program.

73.    Students agreed to take out loans with the expectation that they would be able to

obtain gainful employment with a commercial airline following the program and pay off the loans over time.

74.    For many students who relied on student loans, such student loans were for $100,000 or more.

75.    The inaugural class progressed through the private pilot license portion of the program and things appeared to run smoothly.

76.    As UAA added more and more students each month, however, students began seeing reductions in their ability to acquire flight time.

77.    Students also began seeing substantial turnover in instructors, leading to frequent reassignments and rescheduling.

78.    Even after the flight time and instructor issues made clear to Defendants that they could not meet the 12-month deadline represented to the general public on their websites and in their marketing, Defendants continued to make these representations to new potential consumer students.

79.    UAA also made representations to Plaintiffs that the school was working to improve processes and reiterated commitments to progress students through the program.

80.    In one instance, UAA held a "graduation ceremony" showing how many students were through the program and even invited press. In reality, though, the "ceremony" was a PR stunt as many of the students were not actually finished with the program.

81.    In the spring of 2024, students began learning that the issues at UAA were not one-off lapses but were instead evidence of UAA and United's misrepresentations as to the length and quality of the UAA program.

82.    UAA was accredited by the Accrediting Commission of Career Schools and Colleges ("ACCSC").

83.    In May of 2024, the ACCSC issued a warning to UAA for failing to comply with accreditation standards.

84.    ACCSC issued the warning, in part, because UAA failed to maintain enrollment at or below 325 students, a cap intended to ensure sufficient resources for students.

85.    Instead of complying with the enrollment cap, UAA *added* students, going from 338 students to 382 in March of 2024.

86.    ACCSC issued the warning, in part, because UAA failed to demonstrate it was financially sound and had the resources to meet student needs.

87.    Beginning around the time of the ACCSC warning letter, UAA began a campaign to expel students, targeting students who were delayed in completing the program and giving a variety of reasons to justify the expulsion.

88.    In August of 2024, ACCSC placed UAA on probation after the school failed to adequately address the commission's prior concerns, including the issues highlighted in the May 2024 warning letter.

89.    Ultimately, instead of complying with the ACCSC accreditation standards, UAA voluntarily withdrew effective January 15, 2025.

**B.  Defendants deceive Anton Anderson.**

90.    Anton Anderson began with UAA in February of 2023.

91.    Mr. Anderson relocated to Arizona to attend UAA.

92.    Mr. Anderson began the program as an already licensed Private Pilot.

93.    He joined the program based on UAA and United's representations that it would be a 12-month program and the fastest and most secure way to become a commercial airline pilot with United Airlines.

94.    UAA and United made these representations to Mr. Anderson through their websites, through social media, through emails, and through a United Aviate representative.

95.     After Mr. Anderson earned his Private Pilot license, he began on-line research into various flight programs while he was at home in Illinois. During his research, he saw that United was opening a flight program.

96.     Specifically, when Mr. Anderson was on vacation in Arizona in April 2021, he again saw advertisements that United was opening a flight program and decided to apply.

97.     While he was in Arizona, Mr. Anderson contacted UAA in April 2021, although UAA was not giving tours, he spoke with UAA employees who explained that it was a 12-month program.

98.     Additionally, on December 1, 2022, UAA Admissions sent Mr. Anderson a letter congratulating him into the program and again "reminding" him that it was a "full time, accelerated program, estimated to take about 12 months total."

99.     In the UAA Conditional Admission preparation packet Mr. Anderson received as well as the Professional Pilot Program Enrollment Agreement, effective January 2023, UAA represented that its program would take ten months to complete, since he already had his private pilot's license.

100.    Furthermore, in Section 3: Campus life handbook, it states: "One of the core values of United Airlines is CARING. It is not only engrained in us to care for others but also care for ourselves. The timeline for this program is twelve months."

101.    After joining the program, Mr. Anderson learned it was not as advertised.

102.    UAA lacked adequate resources to allow Mr. Anderson to graduate within the advertised timeframe of 12 months.

103.    UAA had delays with their aircraft, their simulators, and their CFIs.

104.    Mr. Anderson would attend his scheduled fly times and there would not be enough instructors or planes to train on.

105.    In addition to tuition, Mr. Anderson incurred tens of thousands of dollars in expenses in order to attend the program.

106.    Ultimately, Mr. Anderson left the program due to a lack of progress, after only receiving two of the six certificates he should have been able to earn in the ten months, he was enrolled at UAA.

**C. Defendants deceive Bethel Banabu.**

107.    Bethel Banabu began with UAA in October of 2022.

108.    Ms. Banabu relocated to Arizona to attend UAA.

109.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

110.    Moreover, she was swayed to join the program by its representations that the program was focused on women in aviation.

111.    UAA and United made these representations to Ms. Banabu through their websites.

112.    After joining the program, Ms. Banabu learned it was not as advertised.

113.    She was assigned multiple different instructors over a short period of time, that prevented her from getting consistent instruction.

114.    Moreover, UAA did not have sufficient resources for the number of students they enrolled in the program.

115.    At times, it would be multiple weeks before Ms. Banabu would receive flight time.

116.    Ms. Banabu was put on a training review plan and was working well with her instructor during that period of time.

117.    In addition to tuition, Ms. Banabu incurred tens of thousands of dollars in expenses in order to attend the program.

118.    In February 2023, Ms. Banabu was blindsided when UAA expelled[1] her during her final review meeting.

**D.  Defendants deceive Anant Bhattacharya.**

119.    Anant Bhattacharya began with UAA in August of 2024.

120.    Ms. Bhattacharya relocated to Arizona to attend UAA.

121.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

122.    Even in the 2024 Academy Class Start Date Acknowledgment Form, it reminded her that the program was a full-time, accelerate course estimated to take about 12 months.

123.    Additionally, on its Professional Pilot Program Enrollment Agreement, it lists the Professional Pilot Program as a 12-month program.

124.    Moreover, she was swayed to join the program by its representations that the program was open to everyone, no matter the person's race/religion/gender identity/sexual orientation.

125.    UAA and United made these representations to Ms. Bhattacharya through their websites, through social media, and through emails.

126.    After joining the program, Ms. Bhattacharya learned it was not as advertised.

127.    She was assigned multiple different instructors and administrators over a short period of time, and a frequently changing schedule that precluded her from getting consistent instruction.

128.    Moreover, Defendants' representations about inclusion and diversity were false. As a transgender woman, Ms. Bhattacharya was told UAA could not offer her housing. UAA later offered to place Ms. Bhattacharya in the male dorms, but Ms. Bhattacharya was not comfortable

---

[1] UAA uses the euphemism "offboarded" to describe students it expels.

with that option and declined.

129.    In addition to tuition, Ms. Bhattacharya incurred tens of thousands of dollars in expenses in order to attend the program.

130.    Ultimately, UAA expelled Ms. Bhattacharya from the program in November of 2024, citing a lack of progress towards completing the private pilot license segment of the program but without considering the lack of consistent instruction.

**E.  Defendants deceive Jennifer Bummer.**

131.    Jennifer Bummer began with UAA in March of 2023.

132.    Ms. Bummer was a small business owner who ran a yoga studio in San Diego before relocating to Arizona to attend UAA. The studio ultimately suffered financially due to Ms. Bummer's extended absence due to delays in the UAA program.

133.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

134.    She was also impressed with the school's affiliation with United.

135.    UAA and United made these representations to Ms. Bummer through their websites and a commercial that aired between December and January of 2023 in San Diego.

136.    After applying, Mr. Thomas Pettit set up Ms. Bummer's on-line interview for her to be admitted into the program.

137.    During that interview, he explained that the interview upon successful completion of the program would serve as her final interview for employment as a First Office with United.

138.    Additionally, in March 2023, Ms. Bummer was invited to an orientation day at UAA.

139.    Ms. Bummer and her husband drove from San Diego to attend.

140.    During the orientation, it was repeatedly highlighted and touted that the incoming students were amongst a very special group that would be joining an accelerated program, and in

1    one year they would have the credentials to become a commercial pilot.

2    141.    During the orientation, it was explained that this would be the fastest path to

3    becoming a commercial pilot with United and UAA students would have priority over other

4    candidates.

5    142.    UAA represented to Ms. Bummer and other students at orientation that the

6    teacher/student ratios were 1:4, or less, that they had lots of new aircraft, and the students should

7    expect to have flight time five days a week.

8    143.    Based on the representations made by UAA and United, Ms. Bummer, stepped away

9    from her husband, her son, and her small business in San Diego to attend the program.

10    144.    After joining the program, Ms. Bummer learned it was not as advertised.

11    145.    The majority of instructors had more than four students, sometimes up to nine

12    students at a time, and Ms. Bummer was only flying, on average, 1-2 times per week.

13    146.    Ms. Bummer was transferred to multiple different instructors, which caused

14    significant delays in proper instruction and flight time.

15    147.    Ms. Bummer was a student until May of 2024, when UAA expelled her from the

16    program.

17    148.    Ms. Bummer's expulsion came after she expressed concern to UAA about not being

18    able to complete the program in 12 months and that she was racking up expenses.

19    149.    Before her expulsion, Ms. Bummer maintained a good status as a student, having

20    never been directed to undergo remedial training.

21    150.    Ms. Bummer, as a result of UAA and United's misrepresentations, was forced to

22    incur tens of thousands of dollars in expenses and tuition. Defendants' misrepresentations left Ms.

23    Bummer with more than $100,000 in debt.

**F.  Defendants deceive Kevin Chapa.**

24
151.    Kevin Chapa began with UAA in December of 2023.

152.    Mr. Chapa relocated to Arizona to attend UAA.

153.    He joined the program based on UAA and United's representations through email communications from UAA, speaking with a UAA representative, visiting the school itself, and through UAA's website and marketing materials.

154.    Specifically, Mr. Chapa first learned about UAA in April 2022.

155.    A flight attendant acquaintance was accepted into the academy which furthered his interest in the program.

156.    John Slater, United's Senior Vice President of inflight service also introduced the program in United emails and newsletters.

157.    The program was described as the fastest and most direct path to the United flight deck.

158.    Mr. Chapa began following UAA updates on social media and continued to educate himself about the program with excitement.

159.    Mr. Chapa recalls seeing a national UAA commercial during an NFL game.

160.    Seeing such a large advertisement, in addition to the school's statement mission to make pilot careers accessible to people from all backgrounds, including, financially, convinced him this was a program backed by real investment and integrity.

161.    Another big impact on his decision to join the program was a "graduation ceremony" post in January 2023, celebrating the first class of approximately 50 students.

162.    Seeing United CEO Scott Kirby, UAA CEO Dana Donati, and even Transportation Secretary Pete Buttigieg at the ceremony really solidified the program's credibility to the public view.

163.    Mr. Chapa was later connected with Tom Pettit, who was the Senior Manager of Admissions at UAA where he answered any questions and concerns, he had about the program.

164.    Thereafter, during an open house on October 6, 2023, in Phoenix, Mr. Pettit reassured the potential students, including Mr. Chapa, that the program would take about 12 months to complete.

165.    At the open house, Mr. Pettit, explained the tuition details, program structure, and told the potential students, including Mr. Chapa, that they would be learning from top-tier instructions.

166.    After joining the program, Mr. Chapa learned it was not as advertised.

167.    Mr. Chapa later learned that the "graduation ceremony" was a ruse; only one of the "graduates" had actually graduated.

168.    He did not finish the program due to the school's inefficient teaching methods; the school frequently changed his instructors, precluding him from getting consistent instruction.

169.    Because of the insufficient resources at the flight school, it took Mr. Chapa nearly a month to get another flight instructor to teach him.

170.    In May 2024, the school received a formal warning from ACCSC over concerns about enrollment practices, advertising, and lack of student support.

171.    Instead of addressing the problems or slowing enrollment, UAA continued bringing in more students—even though they were over capacity.

172.    Eventually, UAA began mass dismissals, likely to get back in compliance with their accreditor. Mr. Chapa was one of those students.

173.    Mr. Chapa, as a result of UAA and United's misrepresentations, was forced to incur tens of thousands of dollars in expenses and tuition.

174.    Mr. Chapa left the program in May 2024.

**G. Defendants deceive Azia Charles.**

175.    Azia Charles began with UAA in March 2022.

176.    Ms. Charles decided to relocate to Arizona to attend UAA because of her love for

21

aviation and was eager for the opportunity to become a pilot.

177.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

178.    Additionally, she was swayed to join the program by its representations that the program was geared toward diversity, equity, and inclusion, no matter the person's background, ethnicity, or gender.

179.    UAA and United made these representations to Ms. Charles through statements through their websites, social media, and emails.

180.    After joining the program, Ms. Charles learned it was not as advertised.

181.    She was assigned multiple different instructors over a short period of time, and each instructor taught differently.

182.    Also, due to the lack of available aircraft for training, she would go weeks without meeting with an instructor or flying.

183.    In addition to tuition, Ms. Charles incurred thousands of dollars in expenses in order to attend the program.

184.    Ultimately, UAA expelled Ms. Charles from the program in September of 2022, citing that she was taking too long to advance and that it looked bad for the program but without considering the lack of aircraft and instructors available for consistent instruction.

**H. Defendants deceive Candice Chen.**

185.    Candice Chen began with UAA in June 2023.

186.    Ms. Chen decided to relocate to Arizona to attend UAA.

187.    Ms. Chen joined the program based on representations made by United and UAA through their websites, social media, and email communications.

188.    Ms. Chen chose to attend United Aviate Academy because she was genuinely inspired by United Airlines' mission to build a more inclusive and representative future in aviation

— one that reflects diversity across gender and race.

189.    The promise of a program committed to training and welcoming both women and people of color into the cockpit was deeply meaningful to Ms. Chen, and she wanted to be part of that positive change within the Aviation industry.

190.    After joining the program, Ms. Chen learned it was not as advertised.

191.    The program lacked sufficient resources to support the number of students enrolled.

192.    Ms. Chen experiences frequent delays in flight training due to limited aircraft and instructor availability, which created scheduling backlogs and significantly impacted her ability to stay on track with the program requirements.

193.    Beyond resource shortages, Ms. Chen encountered flight instructors who, unfortunately, lacked effective teaching skills.

194.    In addition to tuition, Ms. Chen incurred tens of thousands of dollars in expenses in order to attend the program.

195.    Ultimately, UAA expelled Ms. Chen from the program in May of 2024, citing a lack of progress of not being able to finish the program within 12 months, as advertised, but without considering the lack of consistent instruction.

196.    Being expelled triggered immediate student loan repayment obligations, which left her with no choice but to begin working full-time and pause her flight training altogether.

**I.    Defendants deceive Shawn Day.**

197.    Shawn Day began with UAA in October of 2023.

198.    Mr. Day resigned from employment of 21 years in Fort Worth, Texas to relocate to Arizona to attend UAA so that he could pursue his dream of becoming a commercial airline pilot while his husband stayed behind at their home in Texas.

199.    In April 2022, Mr. Day was at his home in Ft. Worth and saw an article on Facebook about UAA.

200.    Mr. Day did his due diligence and research by touring other flight schools, reaching out to people on Facebook regarding UAA, and even did an informal tour of the school.

201.    Although he had been accepted at and been approved for financial aid at another school in Texas, Mr. Day joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

202.    He also joined the program because of the diversity on campus, and was impressed with the advertised culture.

203.    UAA and United made these representations to Mr. Day through their websites, social media, emails, and other marketing and advertising mechanisms.

204.    Around the onboarding and initial enrollment phase, Tom Petti, and others, played a central role in setting expectations and communicating that UAA was a 12-month program.

205.    In addition to tuition, Mr. Day incurred tens of thousands of dollars in expenses in order to attend the program.

206.    In his first couple months in the program, he was flying 3-4 times a week or was in the simulator (barring weather or mechanical issues), and was scheduled regularly.

207.    When Mr. Day's flight instructor became no longer available, he no longer received consistent instruction.

208.    Due to UAA and United's lack of resources he was precluded from receiving consistent instruction and was therefore put into a remedial program.

209.    Ultimately, UAA expelled Mr. Day from the program in May of 2024, citing that he was taking too long to advance but without considering the lack of instructors available for consistent instruction.

**J.  Defendants deceive Molly Earnhardt.**

210.    Molly Earnhardt began with UAA in June 2023.

211.    Ms. Earnhardt relocated to Arizona to attend UAA.

212. Ms. Earnhardt was enrolled in college at the time and only considered applying if she could complete the program within the advertised 12-month program.

213. Ms. Earnhardt already had significant flight experience, so she entered the program with the understanding that she would be able to earn her private pilot's license in approximately two months.

214. Ms. Earnhardt joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

215. UAA and United made these representations through their websites, through social media, and through UAA representatives.

216. Additionally, Ms. Earnhardt spoke with Thomas Pettit, who was in charge of the interview process.

217. Mr. Pettit confirmed that the program was a 12-month program when she asked him.

218. Ms. Earnhardt also spoke with Sherri Harwood and Natalia Funez when she went for a tour of UAA in October 2022. At that time, she was again told that the program was a 12-month program.

219. Ms. Harwood and Ms. Funez also told Ms. Earnhardt that she would be flying five days a week.

220. After joining the program, Ms. Earnhardt learned it was not as advertised.

221. During the 9-10 weeks, Ms. Earnhardt was in the program, she only completed a total of 11 flights, due to the lack of instructors.

222. Ms. Earnhardt emailed the student advisor to express concerns about completing the program within the 12-month period, and when she arrived at the meeting there was an additional UAA employee present.

223. This UAA employee took over the meeting, raised his voice, and called her

"idiotic".

224.    Ms. Earnhardt ultimately decided to withdraw from the program due to the lack of instruction, training, flight time, and UAA's failure to address her concerns during her meeting.

225.    In addition to tuition, Ms. Earnhardt incurred thousands of dollars in expenses in order to attend the program.

**K. Defendants deceive Blake Falls.**

226.    Blake Falls began with UAA in August 2022.

227.    Mr. Falls relocated to Arizona to attend UAA. After being told there would be a dorm room available, Mr. Falls arrived in Arizona and was told he would need to relocate off campus and incur additional expenses due to a new reassignment of rooms.

228.    He joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

229.    UAA and United made these representations through their websites and through emails.

230.    Around March 2021 while at home in Pennsylvania, Mr. Falls was on-line researching various flight programs and UAA "popped up" as a fast-track pipeline program to becoming a commercial airline pilot.

231.    After some additional on-line research, he applied for the program.

232.    In January 2022, United Human Resources emailed Mr. Falls a UAA Conditional Admission preparation packet that again represented that it was a 12-month program.

233.    Furthermore, during the in-person orientation, Pamela Williams, former Director of Academy Service, along with other UAA employees, continued to heavily promote the 12-month program timeline.

234.    After joining the program, Mr. Falls learned it was not as advertised.

235.    Mr. Falls completed private training in around three months, but UAA did not

schedule him for the checkride to test out of private pilot training until 13 months into the program.

236.    Mr. Falls could not timely advance through the program due to (a) not being scheduled for flights, (b) maintenance issues limiting available aircraft, (c) and a lack of available instructors. All the while, UAA continued to add additional students.

237.    During several months, Mr. Falls would only be able to fly once or twice.

238.    When Mr. Falls began training for his instrument rating, it took three weeks to schedule his first flight.

239.    While training for his instrument rating, Mr. Falls was repeatedly reassigned instructors.

240.    In addition to tuition, Mr. Falls incurred tens of thousands of dollars in expenses in order to attend the program.

241.    Ultimately, UAA expelled Mr. Falls from the program in April of 2024, citing that he was taking too long to advance but without considering the lack of resources available for consistent instruction.

242.    At that time, UAA expelled or removed almost 100 students in a two-week period.

243.    After expelling Mr. Falls, UAA requested that Mr. Falls remain in the United Aviate career program to work for United after going to school somewhere else.

**L.  Defendants deceive Adela Gallegos.**

244.    Adela Gallegos began with UAA in December 2021.

245.    Ms. Gallegos relocated to Arizona to attend UAA.

246.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

247.    Moreover, she was swayed to join the program by UAA and United's representations that this was the fastest way to become a commercial pilot.

248.    In April 2021, Ms. Gallegos began independent research regarding UAA, after a

friend sent her the UAA website link on April 23, 2021.

249.    When Ms. Gallegos started at UAA, Dana Donati, Jay Sutherland, and Scott Kirby emphasized that it was an accelerated program where the students would be flying five days a week and finishing in 12 months.

250.    Ms. Gallegos was in the inaugural class and was told during the first week of ground training in early January 2022, the program was supposed to take 8–12 months.

251.    She was still in the program two years later.

252.    Additionally, in the Incoming Class Teams Live Q&A, UAA represented to Ms. Gallegos, and other students, that the teacher/student ratios were 1:4.

253.    In January 2023, United held a "graduation ceremony" for students who had completed all seven ratings.

254.    In reality, only one of those students actually completed all seven ratings.

255.    In July 2023, Ms. Gallegos was still a student, but became a certified flight instructor.

256.    Between July 2023 and February 2024, she was working as a flight instructor and was also a student in the program.

257.    As a flight instructor, Ms. Gallegos noticed that the students were not progressing through the program due to the lack of resources available.

258.    Students in the program would not receive enough flight time to complete the program due to the lack of instructors and aircraft.

259.    UAA continued to take more students each month regardless of their failure to adequately provide sufficient resources for the students it already had.

260.    Ms. Gallegos was an instructor, working effectively on-call seven days per week.

261.    She was overworked because of the lack of instructors, which made it difficult to

complete the program as a student.

262.    She voiced her concerns regarding the program to the administrative department at UAA but was essentially ignored.

263.    In addition to tuition, Ms. Gallegos incurred tens of thousands of dollars in expenses in order to attend the program.

264.    Ms. Gallegos did not complete the program and left UAA in February of 2024.

**M. Defendants deceive Norbertha Garcia.**

265.    Norbertha Garcia began with UAA in October of 2022.

266.    Ms. Garcia relocated to Arizona to attend UAA.

267.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

268.    UAA and United made these representations to Ms. Garcia through various marketing and advertising mechanisms.

269.    Specifically, United represented in a press release that was published in April 2021, that within a year, UAA students can start earning income upon receiving their commercial pilot license.

270.    Furthermore, during her in-person orientation meeting at UAA, approximately a month prior to her enrollment, it was directly communicated to the students at orientation, including Ms. Garica, that UAA was a 12-month program.

271.    Around the onboarding and initial enrollment phase, Dana Donati, former CEO of UAA; Pamela Williams, former Director of Academy Service; Jan Panagos, former Performance & Training Lead; and Carmen West, former Director and Head of People and Culture ("HR"), played a central role in setting expectations and communicating that UAA was a 12-month program.

272.    After joining the program, Ms. Garcia learned it was not as advertised.

273.    There were not enough aircraft which precluded her from getting consistent instruction.

274.    Additionally, while a student at UAA, an instructor grabbed her iPad out of her hands and slammed it against the simulator, frightening her.

275.    Ms. Garcia voiced her concerns regarding "injustices," including to a mentor.

276.    Ms. Garcia was the Latino Pilots Association Chapter Founder and President on campus.

277.    During her time at UAA, a student action group was founded at UAA, due to students needing to be able to speak up and not face retaliation.

278.    In addition to tuition, Ms. Garcia incurred tens of thousands of dollars in expenses in order to attend the program.

279.    Ultimately, in June 2023, UAA terminated Ms. Garcia's enrollment in the program without providing any further explanation for the decision.

**N. Defendants deceive Filipe and Kana Ginza.**

280.    Filipe and Kana Ginza—husband and wife—began with UAA in December 2021.

281.    They relocated to Arizona from Chicago to attend the program.

282.    Before joining UAA, each of the couple worked as flight attendants for United where the airline advertised its United Aviate program and the UAA school in particular.

283.    In particular, Filipe and Kana Ginza were swayed by United and UAA's promises, made through marketing emails, social media, website content, and UAA representatives, that the program would put them on the career path to become commercial pilots and achieve all of the necessary ratings and certifications in one year.

284.    Specifically, the couple's United Aviate Academy Admissions Letters, dated September 28, 2021, stated: "As a reminder, this is a full time, accelerate program, estimated to take about 11 months total."

285.    When the couple enrolled in the program, they each signed an enrollment agreement with an anticipated completion date exactly 12 months after their start date.

286.    The couple's path through the program included substantial delays due to lack of flight time, unavailability of aircraft, inconsistent availability of instructors and the school's favoring and prioritization of chosen students.

287.    Despite the challenges, Filipe and Kana Ginza both finished the program, albeit long after the promised duration of 12 months. Filipe Ginza finished in January 2024 and Kana Ginza finished in July 2023.

288.    As a result of delays, the couple incurred substantial additional costs and expenses and were set back years of career development.

289.    Additionally, the couple were promised that their status of taking a "leave of absence" from United to attend the program would ensure that they retained their benefits when they returned to work for United as the United Aviate program was sold to them. After the substantial delay to complete the program, though, both were told they no longer retained their benefits.

## O. Defendants deceive Rick Gonzalez.

290.    Rick Gonzalez began with UAA in January of 2022.

291.    He joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

292.    Moreover, he was swayed to join the program by UAA and United's representations that this was the fastest way to become a pilot at United Airlines.

293.    UAA and United made these representations to Mr. Gonzalez through various marketing and advertising mechanisms, including their own websites in 2021 and 2022, while he was living in San Bernardino, California.

294.    Mr. Gonzalez discovered UAA through its internet advertising in February 2021,

1  where UAA and United represented that it would be a 12-month program.

2      295.    In particular, around the onboarding and initial enrollment phase, former CEO of

3  UAA, Dana Donati, along with Jay Sutherland, Elizabeth Grambo, Bradley Kathrins, and Brian

4  Chevlin played a central role in setting expectations and communicating that UAA was a 12-

5  month program.

6      296.    Furthermore, in Section 3: Campus life handbook, it states: "One of the core values

7  of United Airlines is CARING. It is not only engrained in us to care for others but also care for

8  ourselves. The timeline for this program is twelve months."

9      297.    After joining the program, Mr. Gonzalez learned it was not as advertised.

10     298.    He also noticed that at some point, UAA and United changed the representations on

11 their website from the "most fast way to United" to the "most secure way to United."

12     299.    When Mr. Gonzalez was accepted into the program and started in January 2022, the

13 school did not have enough resources with aircraft, flight instructors, or administrative staff to

14 fulfill the 12 months or less requirement.

15     300.    Due to the shortage of instructors and aircraft, students in the program would not

16 receive enough flight time to complete the program in 12 months, if at all.

17     301.    Mr. Gonzalez became an instructor at UAA and was essentially required to teach at

18 the associated Lufthansa Aviation Training (LAT) flight school.

19     302.    In addition to tuition, Mr. Gonzalez incurred tens of thousands of dollars in expenses

20 in order to attend the program.

21     303.    Ultimately, Mr. Gonzalez completed the program in January of 2024.

**P. Defendants deceive Chris Hall.**

22
23     304.    Chris Hall began with UAA in February of 2022.

     305.    Mr. Hall relocated to Arizona to attend UAA.

24
     306.    He joined the program based on UAA and United's representations that it would be

a 12-month program providing a path to becoming a commercial pilot, that he would have all seven ratings and certificates, and that it was a direct path to working as a pilot for United Airlines.

307.    UAA and United made these representations to Mr. Hall through their websites and through emails.

308.    When Mr. Hall enrolled in the program, he signed an enrollment agreement with his anticipated completion date exactly 12 months after his start date.

309.    After joining the program, Mr. Hall learned it was not as advertised.

310.    There were instructor and aircraft shortages, and too many students enrolled in the program which caused significant delays.

311.    UAA and United continued urging students to join the program, and UAA continued to add new students, despite the lack of resources necessary to accommodate existing students.

312.    Mr. Hall was a student until February of 2023, when UAA expelled him from the program.

313.    In addition to tuition, Mr. Hall incurred tens of thousands of dollars in expenses in order to attend the program.

**Q. Defendants deceive Cairen Howard.**

314.    Cairen Howard began with UAA in March of 2022.

315.    Mr. Howard left college and relocated to Arizona to attend UAA.

316.    He joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

317.    UAA and United made these representations to Mr. Hall through their websites and through emails.

318.    Specifically, Mr. Howard received a promotional email from United Human Resources, signed by UAA Admissions on December 15, 2021, stating, "As a reminder, this is a full time, accelerated program that is estimated to take about 11 months total…"

319. Additionally, Mr. Howard received a promotional email from the United Aviate Team on December 6, 2021, stating that "Students at the academy will undergo a rigorous, year-long training program, positioning them for a career that reflects United's high standard…"

320. In Mr. Howard's United Aviate Academy Admissions Letter, UAA stated: "As a reminder, this is a full time, accelerate program, estimated to take about 12 months total."

321. Additionally, he was told that if he had a private pilot license, the program would take less than 12 months.

322. United's website represented the Instrument Rating could be completed in two months, but Mr. Howard's took nearly four months (March 7 – June 29, 2022).

323. This delay made it nearly impossible to complete the remainder of his training within the promised timeline which caused unexpected additional private loan funding to be necessary.

324. In addition to tuition, Mr. Howard incurred tens of thousands of dollars in expenses in order to attend the program.

325. Mr. Howard completed the program March 30, 2023.

326. Prior to completing the program, he became a flight instructor at UAA.

327. As an instructor, Mr. Howard had up to seven students at a time.

328. Mr. Howard noticed there were instructor and aircraft shortages, and too many students enrolled in the program which caused significant delays.

329. In June 2023, Mr. Howard was verbally terminated as an instructor for going over his flight hours.

**R. Defendants deceive Cameron James.**

330. Cameron James began with UAA in October of 2023.

331. Mr. James sold his home and uprooted his life to relocate to Arizona to attend UAA.

332. He joined the program based on UAA and United's representations about the

1    program through email communications, and other marking and advertising mechanisms.

2    333.    Mr. James was already in United's Aviate career program, which was separate from

3    UAA.

4    334.    Through the Aviate program, he heard about UAA and had high hopes for the

5    program.

6    335.    Furthermore, in May 2023, while Mr. James was a student at MSU Denver, UAA

7    announced its partnership with the college.

8    336.    During the presentation, UAA represented to Mr. James, and the other attendees

9    that it was a 12-month accelerated program.

10    337.    After waiting almost two years to be accepted into the program, he learned that it

11    was not as advertised.

12    338.    Towards the end of his instrument rating, his primary instructor left the school, and

13    it took almost two months for him to get a new instructor.

14    339.    UAA failed to provide adequate and accredited instructors for its students.

15    340.    Students who were without an assigned instructor, waiting on an instructor, or had

16    an instructor that was busy or with limited availability had little to no access to simulators or flight

17    time.

18    341.    Of concern, students in the program were sometimes evaluated by instructors who

19    were not pilots themselves.

20    342.    Additionally, there was a lack of uniformity and standardization between the

21    instructors at UAA which created confusion and delays.

22    343.    In addition to tuition, Mr. James incurred tens of thousands of dollars in expenses

23    in order to attend the program.

24    344.    Ultimately, UAA expelled Mr. James from the program in June of 2024.

345.    Upon information and belief, UAA was expelling students from the program because of its internal issues in running the academy.

**S.  Defendants deceive Lok Sum Ida Lau.**

346.    Lok Sum Ida Lau began with UAA in September of 2022.

347.    Ms. Lau relocated to Arizona to attend UAA.

348.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot and would be hired upon completion of the course.

349.    UAA and United made these representations to Ms. Lau through their websites.

350.    Additionally, United promoted the 12-month UAA program to its employees through its employee website Flying Together.

351.    Furthermore, during her orientation meeting at UAA, approximately a month prior to her enrollment, it was directly communicated to the students at orientation, including Ms. Lau, that UAA was a 12-month program.

352.    In addition to tuition, Ms. Lau incurred tens of thousands of dollars in expenses in order to attend the program.

353.    She was assigned to multiple different instructors over a short period of time, and there were not enough aircraft which precluded her from getting consistent instruction.

354.    Ms. Lau did not complete the program because UAA eventually slowly stopped training her and failed to provide the necessary flight time in order to complete the program.

**T.  Defendants deceive Jennifer Lee.**

355.    Jennifer Lee began with UAA in December of 2023.

356.    She relocated from California to attend the program.

357.    Ms. Lee joined the program based on Defendants' representations—made on Defendants' websites, in emails, and through social media—that it was a 12-month program and

that Defendants were committed to training the students.

358.    Ms. Lee first learned about UAA during her induction training as a flight attendant in for United in December 2021.

359.    From that point on, Ms. Lee began researching the program.

360.    Ms. Lee followed UAA on Instagram, watched their YouTube content, and followed their media coverage on Facebook.

361.    In particular, in January 2023, Ms. Lee saw social media posts showing a graduation ceremony and lauding the career potential for folks who finished the program.

362.    The presence of United CEO Scott Kirby, UAA CEO Dana Donati, and Transportation Secretary Pete Buttigieg at the graduation further reinforced her confidence in the program.

363.    Unfortunately, Ms. Lee later learned that the "graduation ceremony" was a ruse; a substantial number of the "graduates" had not actually graduated.

364.    Also, on February 12, 2023, UAA aired a nationwide commercial during the Super Bowl promoting UAA and its mission.

365.    During Ms. Lee's pre-interview and October 2023 orientation, Tom Petti represented that the program would take about 12 months to complete, with five days a week of flight time, and provided a breakdown of tuition costs, and course timelines.

366.    Mr. Petti described the instructions as "the cream of the crop," stating that UAA was the best in the industry because of its affiliation with United.

367.    After accepting her tuition payments and causing Ms. Lee to incur thousands of dollars in costs and expenses, UAA failed to deliver on its promises.

368.    Ms. Lee had limited access to instructors and flight time. Her first two instructors were first-time instructors still in the process of completing the program.

369.    When she did get time with instructors, they were inconsistent in what they taught her to do. The lack of resources and organization effectively made it a "self-study" program.

370.    In May 2024, UAA received a formal warning from ACCSC, citing serious concerns regarding the school's management, enrollment practices, and failure to meet standards for truthful advertising and student support.

371.    Despite being fully aware that they were under investigation for operating over capacity, the school continued to aggressively enroll new students—far beyond the limits their infrastructure and staff could effectively support.

372.    Ultimately, Ms. Lee was expelled from the program in July of 2024 with many others in order to comply with the enrollment cap of UAA's accrediting body.

**U. Defendants deceive Joshua Lim.**

373.    Joshua Lim began with UAA in October of 2023.

374.    Mr. Lim relocated to Arizona to attend UAA.

375.    In addition to tuition, Mr. Lim incurred tens of thousands of dollars in expenses in order to attend the program.

376.    He joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

377.    Moreover, he joined the program because he always wanted to be a pilot. He first started training in 2019, but financially it was very difficult. Once he heard about UAA, he thought it would be a good opportunity.

378.    UAA and United made these representations to Mr. Lim through their websites.

379.    Initially, Mr. Lim's father sent him the link to the UAA website. This prompted Mr. Lim to conduct further research into the program.

380.    After speaking with his family, he applied in February 2022.

381.    Upon information and belief, there was only one person working to communicate

38

with all the potential students, she later resigned from UAA.

382.    Mr. Lim had significant gaps in his training due to the lack of resources at the school.

383.    UAA failed to provide enough flight instructors and aircraft for students to progress through the program as advertised.

384.    Ultimately, UAA expelled Mr. Lim from the program in May of 2024 at the end of his private license training, citing a failure of certain requirements but without considering the lack of consistent instruction and flight time.

385.    Prior to being expelled, Mr. Lim, four other instructors, and some fellow students advocated for him to stay in the program, UAA denied his request.

**V.  Defendants deceive Daniel Madison.**

386.    Daniel Madison began with UAA in December of 2021.

387.    He first learned about UAA in April 2021 while stationed at Fort Bragg, North Carolina, nearing the end of his Army service.

388.    He joined the program based on UAA and United's representation that it would be a fast-track program.

389.    Defendants told him the program at UAA would take 12 months.

390.    Prior to joining the program, he watched promotional videos from United in which representatives claimed the program would be fast-paced and completed in under a year.

391.    Specifically, Mr. Madison's United Aviate Academy Admissions Letter, dated November 4, 2021, stated: "As a reminder, this is a full time, accelerate program, estimated to take about 11 months total."

392.    In early information sessions, the primary representatives, Mary Ann Schafer and Mike Bonner, outlined the program structure and timeline of 12 months.

393.    Once enrolled in the program, senior leadership — including CEO Dana Donati and Chief Pilot Brian Chevlin — continued to make the same claims about program length and

progression. This was echoed by various UAA staff and United representatives while Mr. Madison was enrolled in the program.

394.    After graduating from UAA in 12 months, United told him he would spend another year as an instructor before working at the regional airlines to get to 1,500 hours building jet time. When that jet time was accrued, he'd then receive a position at United Airlines as a commercial pilot.

395.    UAA and United made these representations to Mr. Madison through their website and once he started the program.

396.    Initially, there were not too many students, enough aircraft, and enough instructors.

397.    Mr. Madison was one of the first students to complete the private pilot license portion of the training.

398.    However, UAA was very disorganized, and continued to admit students into the program which created a lack of consistent instruction, a lack of flight time, and a lack of aircraft for the students to use.

399.    In February of 2022, Mr. Madison was required to "reinterview" for UAA in order to continue with the program.

400.    He was the only student to fail the interview and was expelled in February 2022 for two months.

401.    After fellow students appealed on his behalf, UAA reinterviewed Mr. Madison and reinstated him around April 2022.

402.    Following his reinstatement, Mr. Madison was hired to work at UAA as an instructor around June 2023 while he continued as a student.

403.    UAA continued to enroll hundreds of students without hiring additional instructors.

404.    Because of this, UAA hired students who completed their CFI to become

1   instructors.

2   405.   In addition to tuition, Mr. Madison incurred tens of thousands of dollars in expenses

3   in order to attend the program.

4   406.   Ultimately, Mr. Madison did not complete the program and quit as an instructor at

5   UAA.

**W. Defendants deceive Sawyer Mills.**

6

7   407.   Sawyer Mills began with UAA in December of 2021.

8   408.   Mr. Mills relocated to Arizona to attend UAA.

9   409.   In addition to tuition, Mr. Mills incurred tens of thousands of dollars in expenses in

10  order to attend the program.

11  410.   He joined the program based on UAA and United's representations that it would be

12  a 12-month program providing a path to becoming a commercial pilot.

13  411.   UAA and United made these representations to Mr. Mills through social media, and

14  email communications.

15  412.   Mr. Mills also subscribed to the UAA newsletter and received many email blasts

16  about the program which influenced his decision to attend.

17  413.   After joining the program, Mr. Mills learned it was not as advertised.

18  414.   There was a lack of resources available for the students which precluded him from

19  getting consistent instruction.

20  415.   There were approximately 20 aircraft and 500 students waiting for flight time. Mr.

21  Mills would sometimes wait weeks before he could get instruction.

22  416.   In two years, Mr. Mills only received approximately 300 hours of flight time.

23  417.   Ultimately, Mr. Mills resigned from the program in August of 2023 due to delays

24  in his training and cost.

**X. Defendants deceive Young Noh.**

418.    Young Noh began with UAA in November of 2023.

419.    Mr. Noh relocated to Arizona to attend UAA.

420.    He joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot, with students also earning ratings in CFI, CFII, ME, and MEI.

421.    UAA and United made these representations to Mr. Noh through their websites and other marketing and advertising mechanisms.

422.    In early February 2021, Mr. Noh was at home in Shreveport, LA having dinner with his family while watching the news on YouTube. It was then, during a news segment, he was first introduced to the existence of the UAA program.

423.    The news segment spoke about the pilot shortage and how United was planning on hiring 10,000 pilots within the next 10 years with about half of that number coming from their own UAA training program in Arizona.

424.    It was always a dream of his to be a pilot, so this piqued his interest and he continued to watch more YouTube videos about the UAA program.

425.    Once he began his research, and reviewing UAA YouTube videos on channels such as CBS Mornings, he started getting push notifications, consistently about the program and the 12-month time frame to become a commercial airline pilot.

426.    Mr. Noh was thoroughly impressed by the UAA program. The website at the time publicized state-of-the-art conditions, accessibility to such, and a program duration of 12 months.

427.    Having a newborn baby at the time, Mr. Noh was extremely cautious when making such a huge life change. He contacted UAA multiple times to ask questions and request more information.

428.    Mr. Noh spoke to Kandi C. Wilson. She helped cement his decision on attending

the program and confirmed one of the most important concerns he had, which was the duration of the training being 12 months.

429.    Mr. Noh applied to UAA on February 18, 2021. After completing all of United's assessment tests, he received his conditional admission letter on April 22, 2022, for the 2022 UAA class.

430.    With the conditional admission letter, Mr. Noh also received the conditional admission preparation packet which again represented that it was a 12-month program.

431.    After joining the program, Mr. Noh learned it was not as advertised.

432.    During the first six weeks, Mr. Noh flew 3-4 times per week and successfully completed 60 percent of the private pilot course. Beginning in the seventh week, Mr. Noh's ability to fly was substantially pared back, dropping to an average of only once per week.

433.    Mr. Noh experienced this lack of flight time due to the unavailability of instructors and poor scheduling and administration.

434.    In addition to tuition, Mr. Noh incurred tens of thousands of dollars in expenses in order to attend the program.

435.    Ultimately, Mr. Noh was expelled from the program and was told that he should take ownership for his failure without considering UAA's failure to provide enough instructors and aircraft.

**Y.  Defendants deceive Jacklyn Pope.**

436.    Jacklyn Pope began with UAA in December of 2021.

437.    Ms. Pope relocated from North Carolina to Arizona to attend UAA.

438.    She joined the program based on UAA and United's representation that it would be a 12-month program providing a path to becoming a commercial pilot. Defendants represented to her that the program would provide a path to a First Officers seat as a rated Commercial Airline Transportation Pilot.

439.    Moreover, she was swayed to join the program by Defendants' representations that the program was open to everyone, no matter the person's race/religion/gender identity/sexual orientation or whether they had prior knowledge or experience in general aviation.

440.    UAA and United made these representations to Ms. Pope through their websites, through emails, in virtual meetings with sponsored aviation organizations, and through other marketing and advertising mechanisms.

441.    Specifically, Ms. Pope received an email from Aviate on December 6, 2021, stating that, "Each student will complete a rigorous year-long training program that prepares them for a career which reflect United's high standard of professionalism…"

442.    Furthermore, in Section 3: Campus life handbook, it states: "One of the core values of United Airlines is CARING. It is not only engrained in us to care for others but also care for ourselves. The timeline for this program is twelve months."

443.    After joining the program, Ms. Pope learned it was not as advertised.

444.    She was assigned multiple instructors, had gaps in her flights, and had very limited flight time, which precluded her from getting consistent instruction.

445.    Despite advertising that students would get opportunities to fly five times per week, UAA did not give Ms. Pope such opportunities. Moreover, the school prioritized some students over others, including Ms. Pope, for flight time.

446.    UAA continued to enroll students even though they lacked resources for the ones they already had in the program.

447.    In addition to tuition, Ms. Pope incurred tens of thousands of dollars in expenses in order to attend the program.

448.    Ms. Pope was expelled from the program in May of 2024 after being in the program for more than 2.5 years.

**Z. Defendants deceive Felicia Ragsdale.**

449.    Felicia Ragsdale began with UAA in October of 2022.

450.    Ms. Ragsdale relocated to Arizona to attend UAA.

451.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

452.    Moreover, she was swayed to join the program by its representations that students in the program would be prioritized in the selection process to become a commercial pilot for United.

453.    UAA and United made these representations to Ms. Ragsdale through social media and other marketing and advertising mechanisms.

454.    On June 30, 2022, UAA sent Ms. Ragsdale an acceptance letter stating, "As a reminder, this is a full time, accelerated program, estimated to take about 12 months total."

455.    Additionally, UAA represented to Ms. Ragsdale in its 2022 UAA Prep Packet, that "The full course takes about a year to complete."

456.    Further, in the Student Informational Session Common Q&A, UAA represented to Ms. Ragsdale, and other students, that the teacher/student ratios were 1:4.

457.    After joining the program, Ms. Ragsdale learned it was not as advertised.

458.    She was assigned six different instructors over a short period of time, and a frequently changing schedule that prevented her from getting consistent instruction.

459.    In addition to tuition, Ms. Ragsdale incurred tens of thousands of dollars in expenses in order to attend the program.

460.    Ultimately, UAA expelled Ms. Ragsdale from the program in February of 2023 through a FaceTime call, citing situational awareness and that she was not performing at the standard required for the number of hours flown but without considering the lack of consistent instruction.

**AA.    Defendants deceive Jackie Taylor.**

461.    Jackie Taylor began with UAA in October of 2023.

462.    Ms. Taylor relocated to Arizona to attend UAA.

463.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

464.    Moreover, she was swayed to join the program by its commitment to diversity and women in aviation.

465.    UAA and United made these representations to Ms. Taylor through their websites, and through various marketing and advertising mechanisms.

466.    Ms. Taylor was also told that she would be flying five days a week.

467.    After joining the program, Ms. Taylor learned it was not as advertised.

468.    She was not provided the training to fly consistently, as promised, which caused gaps in her training and precluded her from getting consistent flight time and proper instruction.

469.    In addition to tuition, Ms. Taylor incurred tens of thousands of dollars in expenses in order to attend the program.

470.    Ultimately, Ms. Taylor resigned from the program in May 2024, because of a lack of progress due to a lack of consistent instruction.

**BB.    Defendants deceive Paige Texas.**

471.    Page Texas began with UAA in March of 2023.

472.    Ms. Texas relocated to Arizona to attend UAA.

473.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

474.    Additionally, she was swayed to join the program by its representation that they had the best technology for training pilots.

475.    UAA and United made these representations to Ms. Texas through their websites,

through emails, and through other various marketing or advertising mechanisms.

476.   United promoted the 12-month UAA program to its employees through its employee website Flying Together.

477.   After joining the program, Ms. Texas learned it was not as advertised.

478.   Over the course of her time in the program, she had more than 13 different instructors which precluded her from getting consistent instruction.

479.   Ms. Texas voiced her concerns regarding the program to the administrative department at UAA but was essentially ignored.

480.   In addition to tuition, Ms. Texas incurred tens of thousands of dollars in expenses in order to attend the program.

481.   Ultimately, Ms. Texas did not complete the program.

**CC.    Defendants deceive Brianna Tittle.**

482.   Brianna Tittle began with UAA in March of 2024.

483.   She relocated from Alaska to join the program.

484.   She joined the program based on UAA and United's representations that it would be a 12-month program and a pathway to becoming a commercial pilot. Defendants also made representations about their commitments to educating women.

485.   UAA and United made the representations through their websites and through a TV advertisement noting the program was a pipeline to a career with United Airlines.

486.   UAA represented to Ms. Tittle in its 2022 UAA Prep Packet, that "The full course takes about a year to complete."

487.   Additionally, in January 2024, Ms. Tittle attended a new student orientation where UAA representatives affirmed that the program was 12 months.

488.   The intensive, 12-month program Ms. Tittle was promised when she signed up, though, was not what she received.

489.    Instead, the program was disorganized and lacked the capability to educate the students in the promised timeframe.

490.    For example, Ms. Tittle had four different instructors for her first four flights; five different by the time she got to her seventh lesson. When she was assigned another instructor for her eighth lesson, he was a brand-new CFI who had just obtained that certification from UAA and was also trying to progress through the remainder of his program. It was students teaching students.

491.    UAA expelled Ms. Tittle six months after she began and when she was on lesson 35 of 36 to obtain the private pilot license.

**DD.    Defendants deceive Jenesis Tucker.**

492.    Jenesis Tucker began with UAA in January of 2023.

493.    Ms. Tucker relocated to Arizona to attend UAA.

494.    She joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

495.    Moreover, she was swayed to join the program based on UAA's affiliation with United Airlines.

496.    Ms. Tucker had a life-long career goal of becoming a pilot and was eager to begin her career as a commercial pilot.

497.    UAA and United made these representations to Ms. Tucker through their website and through emails.

498.    After joining the program, Ms. Tucker learned it was not as advertised.

499.    Ms. Tucker continually would not get responses from her instructors, which prevented her from getting consistent instruction.

500.    Due to the lack of communication by the instructors, Ms. Tucker would go weeks without flight training and would fall behind.

501.    Because of the lack of consistency in training, lack of aircraft and lack of instructors, she was precluded from progressing through the program as expected.

502.    In addition to tuition, Ms. Tucker incurred tens of thousands of dollars in expenses in order to attend the program.

503.    Ultimately, UAA expelled Ms. Tucker in May of 2024 during her last lesson for her instrument rating.

**EE.    Defendants deceive Christian Turner.**

504.    Christian Turner began with UAA in July of 2023.

505.    Mr. Turner relocated to Arizona to attend UAA.

506.    He joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

507.    Moreover, he was swayed to join the program based on UAA's affiliation with United Airlines.

508.    Initially, Mr. Turner's mother saw a Facebook advertisement for UAA in 2022 and told him to look into the program.

509.    After Mr. Turner reviewed the UAA website to get information about the cost and the length of the program, he applied.

510.    UAA and United made these representations to Mr. Turner through their website through social media posts and advertisements, and through speaking with a UAA representative.

511.    Mr. Turner toured UAA where he was told that the program was 12 months to graduate and a path to becoming a commercial pilot for United.

512.    Furthermore, the UAA Conditional Admission preparation packet sent to Mr. Turner, again represented that it was a 12-month program.

513.    Around the onboarding and initial enrollment phase, Pamela Williams, former Director of Academy Service, Tom Petti, and others, played a central role in setting expectations

and communicating that UAA was a 12-month program.

514.    After joining the program, Mr. Turner learned it was not as advertised.

515.    Mr. Turner could not timely advance through the program due to (a) not being scheduled for flights, (b) limited available aircraft, (c) and a lack of available instructors.

516.    Ultimately, UAA expelled Mr. Turner from the program in July of 2024, citing a lack of progress but without consideration of the lack of consistent instruction.

**FF.    Defendants deceive Jon Watkins.**

517.    Jon Watkins began with UAA in September of 2022.

518.    In addition to tuition, Mr. Watkins incurred tens of thousands of dollars in expenses in order to attend the program.

519.    He joined the program based on UAA and United's representations that it would be a 12-month program providing a path to becoming a commercial pilot.

520.    Specifically, Mr. Watkins saw an internet advertisement around Christmas of 2021 advertising the 12-month UAA program. Ten months later, he relocated to Arizona to attend the program.

521.    UAA made these representations to Mr. Watkins through their websites, and through speaking with a United Aviate representative.

522.    Pamela Williams, former Director of Academy Service at UAA represented to Mr. Watkins that the program was capable of being completed in 12 months.

523.    After joining the program, Mr. Watkins learned it was not as advertised.

524.    There was inconsistent instruction from his instructors with no clear expectations.

525.    Mr. Watkins was precluded from getting consistent flying because of the shortage of available instructors.

526.    During his time as a student in the program, Mr. Watkins voiced his concerns to management regarding a dangerous situation about flying in bad weather during his training. His

flight instructor forced him to fly in unsafe weather conditions, ultimately causing them to have to divert to an alternate airport.

527.    Ultimately, UAA expelled Mr. Watkins from the program in January of 2024, citing a lack of progress but without consideration of the lack of consistent instruction.

**GG.    Defendants deceive Jonathan Wizard.**

528.    Jonathan Wizard began with UAA in February 2023.

529.    Mr. Wizard relocated to Arizona to attend UAA.

530.    He joined the program based on UAA and United's representations that it would be a 12-month program and a direct path to United employment as a commercial pilot.

531.    UAA and United made these representations to Mr. Wizard through various marketing and advertising mechanisms, as well as through the nightly news.

532.    Between December 2021 through all of 2022, Mr. Wizard saw dozens of news, Instagram, YouTube, and other social media clips advertising UAA's 12-month program, which he saw throughout the state of California on his television, phone, and computer.

533.    Additionally, UAA CEO Dana Donati, shared the 12-month timeline to complete the program during a town hall event at the UAA campus in June.

534.    During his time in the program, he experienced significant delays and inconsistent training resources. Administrators would favor certain students other than Mr. Wizard for flight scheduling and/or evaluations.

535.    In addition to tuition, Mr. Wizard incurred tens of thousands of dollars in expenses in order to attend the program.

536.    Mr. Wizard completed the commercial pilot certificate and instrument ratings but was forced to obtain his CFI, CFII, CME and MEI training at another school.

**HH.    Plaintiffs suffer career damages.**

537.    In addition to the direct damages that Plaintiffs suffered as a result of Defendants'

conduct, Plaintiffs suffered consequential damages in the form of lost economic opportunity.

538.    The UAA program was promised to be a 12-month program that would prepare students for a career as a commercial pilot.

539.    Defendants' failure to live up to the representations they made about the program delayed or prevented Plaintiffs from careers as commercial pilots, thereby delaying or preventing them from obtaining the economic benefits of working as a commercial pilot, including salaries and bonuses customarily earned by commercial pilots.

## CLAIMS FOR RELIEF

**First Claim for Relief:**
**Violation of the Arizona Consumer Fraud Act**
**(by all Plaintiffs against both Defendants)**

540.    Plaintiffs incorporate the foregoing allegations as if set forth verbatim herein.

541.    The Arizona Consumer Fraud Act provides:

The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A).

542.    UAA's offer of education services qualifies as "merchandise" under the Consumer Fraud Act.

543.    UAA "sold" its "merchandise"—the education services—to Plaintiffs in exchange for tuition and fee payments.

544.    UAA made false promises and/or misrepresentations to Plaintiffs with respect to the length of time the UAA program would take, the resources available to students, and otherwise the quality and cost of the program.

545.   United made false promises and/or misrepresentations to Plaintiffs with respect to the length of time the UAA program would take, the resources available to students, and otherwise the quality and cost of the program.

546.   UAA and United made those false promises and misrepresentations with the intent that Plaintiffs would rely on them.

547.   Plaintiffs reasonably relied on Defendants' false representations and/or omissions when deciding to enroll with UAA.

548.   Defendants' misrepresentations concerned the fundamental qualities of the "merchandise" such that it cannot be said a consumer did not rely on the misrepresentations when choosing to purchase the advertised services.

549.   Defendants made their misrepresentations and false promises through a variety of advertisements, including websites, social media posts, emails, and television broadcasts.

550.   Plaintiffs suffered damages as a direct and proximate result of Defendants' consumer fraud.

551.   Defendants' deceptive practices were wanton, reckless, spiteful, motivated by ill-will, and/or were made with reckless indifference to the rights, interests, and feelings of Plaintiffs, therefore entitling them to an award of punitive damages.

**Second Claim for Relief:**
**Negligent Misrepresentation**
**(by all Plaintiffs against both Defendants)**

552.   Plaintiffs incorporate the foregoing allegations as if set forth verbatim herein.

553.   Defendants owed Plaintiffs a duty to exercise reasonable care not to make misrepresentations as to the character or quality of services they offered.

554.   Similarly, Defendants owed Plaintiffs a duty to exercise reasonable care to disclose:

a.   matters known to them that they know to be necessary to prevent their partial or

ambiguous statement of the facts from being misleading;

b.  subsequently acquired information that they know will make untrue or misleading a previous representation that when made was true or believed to be so;

c.  the falsity of a representation not made with the expectation that it would be acted upon, if they subsequently learn that the other is about to act in reliance upon it in a transaction with them; and

d.  facts basic to the transaction, if they know that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

555.    Defendants breached that duty by unreasonably misrepresenting the character and quality of the UAA program, including that it was a 12-month program that was sufficiently resourced and that would enable students to begin careers as commercial airline pilots.

556.    Plaintiffs reasonably relied on Defendants' misrepresentations when they agreed to enroll with UAA.

557.    Defendants' misrepresentations concerned the fundamental qualities of the UAA program such that it cannot be said a student did not rely on the misrepresentations when choosing to enroll in the program.

558.    Plaintiffs suffered damages as a direct and proximate result of Defendants' negligent misrepresentations, including economic damages and noneconomic damages including but not limited to emotional distress, mental anguish, anxiety, humiliation, and inconvenience in an amount to be proven at trial.

559.    Defendants' negligent misrepresentations were wanton, reckless, spiteful, motivated by ill-will, and/or were made with reckless indifference to the rights, interests, and

feelings of Plaintiffs, therefore entitling them to an award of punitive damages.

**Third Claim for Relief:**
**Fraudulent Misrepresentation**
**(by all Plaintiffs against both Defendants)**

560. Plaintiffs incorporate the foregoing allegations as if set forth verbatim herein.

561. Defendants made false representations to Plaintiffs that the UAA program was a 12-month program that was sufficiently resourced and that would enable students to begin careers as commercial airline pilots.

562. A misrepresentation is fraudulent if the maker:

    e. knows or believes that the matter is not as he represents it to be,

    f. does not have the confidence in the accuracy of his representation that he states or implies, or

    g. knows that he does not have the basis for his representation that he states or implies.

563. Defendants' misrepresentations were fraudulent in that they either knew the representations were false or knew that they were ignorant as to whether the representations were false.

564. Plaintiffs were ignorant as to the falsity of Defendants' misrepresentations.

565. Plaintiffs reasonably and justifiably relied on Defendants' misrepresentations.

566. Defendants' misrepresentations concerned the fundamental qualities of the UAA program such that it cannot be said a student did not rely on the misrepresentations when choosing to enroll in the program or when choosing to enter into student loan agreements in connection with enrolling with UAA.

567. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs suffered damages, including economic damages and noneconomic damages including but not limited to emotional distress, mental anguish, anxiety, humiliation, and inconvenience in

1  an amount to be proven at trial.

2      568.    Defendants' fraudulent misrepresentations were wanton, reckless, spiteful,

3  motivated by ill-will, and/or were made with reckless indifference to the rights, interests, and

4  feelings of Plaintiffs, therefore entitling them to an award of punitive damages.

5                          **Fourth Claim for Relief:**
                           **Fraudulent Inducement**
6                  **(by all Plaintiffs against both Defendants)**

7      569.    Plaintiffs incorporate the foregoing allegations as if set forth verbatim herein.

8      570.    Defendants made false representations to Plaintiffs that the UAA program was a 12-

9  month program that was sufficiently resourced and that would enable students to begin careers as

10  commercial airline pilots.

11     571.    Defendants' misrepresentations were material.

12     572.    Defendants knew their representations about the program were false or knew that

13  they were ignorant as to whether the representations were true.

14     573.    Defendants intended that Plaintiffs would act on the misrepresentations by enrolling

15  with UAA and by applying for and obtaining student loans in order to attend UAA.

16     574.    Plaintiffs did not know Defendants' representations were false, and they reasonably

17  and justifiably relied on the representations when enrolling with UAA and obtaining student loans.

18     575.    Defendants' misrepresentations concerned the fundamental qualities of the UAA

19  program such that it cannot be said a student did not rely on the misrepresentations when choosing

20  to enroll in the program or when choosing to enter into student loan agreements in connection

21  with enrolling with UAA.

22     576.    As a result of Defendants' misrepresentations, Plaintiffs were fraudulently induced

23  into enrolling with UAA and entering into student loan agreements in connection with enrolling

24  with UAA.

577.   Defendants' fraudulent inducement of Plaintiffs caused them to suffer damages, including economic damages and noneconomic damages including but not limited to emotional distress, mental anguish, anxiety, humiliation, and inconvenience in an amount to be proven at trial.

578.   Defendants' fraudulent misrepresentations were wanton, reckless, spiteful, motivated by ill-will, and/or were made with reckless indifference to the rights, interests, and feelings of Plaintiffs, therefore entitling them to an award of punitive damages.

**Fifth Claim for Relief:**
**Negligence**
**(by all Plaintiffs against both Defendants)**

579.   Plaintiffs incorporate the foregoing allegations as if set forth verbatim herein.

580.   Defendants owed Plaintiffs a duty of care to exercise reasonable and truthful practices in the advertising and marketing of their products and services so as not to mislead or cause foreseeable harm.

581.   Defendants, in breach of that duty, failed to exercise reasonable and truthful practices in the advertising and marketing of UAA to Plaintiffs.

582.   As a direct and proximate result of Defendants' breach of their duty of care, Plaintiffs suffered damages.

583.    Defendants' breaches were wanton, reckless, spiteful, motivated by ill-will, and/or were made with reckless indifference to the rights, interests, and feelings of Plaintiffs, therefore entitling them to an award of punitive damages.

**Sixth Claim for Relief:**
**Civil Conspiracy**
**(by all Plaintiffs against both Defendants)**

584.   Plaintiffs incorporate the foregoing allegations as if set forth verbatim herein.

585.   Defendants, upon information and belief, entered into a combination, agreement, or

mutual understanding with one another to engage in a scheme to defraud Plaintiffs and other prospective students through materially false representations concerning the nature, quality, and outcomes of the flight training programs offered by UAA.

586.    Defendants did engage in the fraudulent misrepresentations to induce Plaintiffs to attend the program.

587.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered damages, including economic damages and noneconomic damages including but not limited to emotional distress, mental anguish, anxiety, humiliation, and inconvenience in an amount to be proven at trial.

588.    Defendants' conduct was wanton, reckless, spiteful, motivated by ill-will, and/or was made with reckless indifference to the rights, interests, and feelings of Plaintiffs, therefore entitling them to an award of punitive damages.

**Seventh Claim for Relief:**
**Aiding and Abetting**
**(by all Plaintiffs against United)**

589.    Plaintiffs incorporate the foregoing allegations as if set forth verbatim herein.

590.    UAA engaged in tortious conduct through its misrepresentations to Plaintiffs concerning its flight school and such tortious conduct caused Plaintiffs to suffer damages.

591.    Upon information and belief, United knew UAA's conduct in promoting the school to Plaintiffs through misrepresentations as to the program's resources and the time it would take to accomplish the program was tortious.

592.    United substantially assisted and encouraged UAA's tortious conduct by repeating UAA's misrepresentations through its extensive marketing presence.

593.    United's assistance and encouragement of UAA's tortious conduct contributed to and exacerbated Plaintiffs' damages, including economic damages and noneconomic damages

including but not limited to emotional distress, mental anguish, anxiety, humiliation, and inconvenience in an amount to be proven at trial.

594.    United's aiding and abetting makes it jointly and severally liable for UAA's tortious conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and:

    h.  Award Plaintiffs general, economic, noneconomic, compensatory, consequential, punitive, and nominal damages at an amount to be determined at trial;

    i.  Award Plaintiffs pre- and post-judgment interest at the highest legal rates;

    j.  Award Plaintiffs their attorneys' fees;

    k.  Award Plaintiffs their costs and expenses, including expert witness costs, as provided by law;

    l.  Award Plaintiffs such further relief that the Court deems just and proper; and

## **JURY DEMAND**

Plaintiffs demand a jury as to all issues so triable.

Respectfully submitted June 17, 2025.

**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE, P.C.**

*/s/ David K. TeSelle*
David K. TeSelle
Joshua Abromovitz
Patrick M. Sweet
Sophia E. Kyziridis
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on June 17, 2025, the foregoing Second Amended Complaint and Jury Demand was filed and served via the Court's CM/ECF system, which will send notification to all counsel of record.

*/s/ Laura M. Ramirez*